**FILED**

AUG 18 2017

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA

v.

JESUS VASQUEZ CANTU,

Defendant.

Case No.: 17CR2376 JLS

**INFORMATION**

Title 18 U.S.C., Sec. 371–
Conspiracy To Commit Bribery

The United States charges that, at all times relevant:

1.    From September 2005 until February 2014, defendant JESUS VASQUEZ CANTÚ (CANTÚ) was an active-duty Officer in the U.S. Navy, serving at the rank of Captain.   From October 2005 to July 2007, CANTÚ was the Assistant Chief of Staff for Logistics (N4) for the Commander of the U.S. Navy's Seventh Fleet aboard the USS Blue Ridge, home-ported in Yokosuka, Japan.   In this position, CANTÚ was responsible for Seventh Fleet logistics planning across all phases of military operations.   From August 2007 to June 2010, CANTÚ was assigned to Military Sealift Command (MSC) headquartered at the Washington Navy Yard, as the Director of Logistics (N4). While at MSC, CANTÚ supported MSC on logistics matters related to MSC's interface with U.S Navy logistics.

2.    From July 2010 to May 2012, CANTÚ was the Deputy Commander for Commander, Task Force 53 (CTF-53)/Commander, MSC Central (MSCCENT) supporting the U.S. Navy's Fifth Fleet in Manama, Bahrain.   While at CTF-53/MSCCENT, CANTÚ was Fifth Fleet's principal logistics agent and fleet logistics coordinator, responsible for scheduling coalition and U.S. Navy Combat

1  Logistics Force ships.  From about May 2012 to January 2014, CANTÚ
2  was the Deputy Commander, MSC Far East (MSCFE) in Singapore.
3  While at MSCFE, CANTÚ oversaw MSC ships that provided logistical
4  sustainment to U.S. Navy ships operating within the Seventh Fleet.

5      3.   As an Officer in the United States Navy, CANTÚ was at
6  all times a "public official" within the definition of Title 18,
7  United States Code, Section 201(a)(1).

8      4.   CANTÚ, as an Officer in the U.S. Navy, had and was
9  assigned various official duties, including, but not limited to
10 those found in the United States Navy Regulations; Department of
11 Defense Directive ("DoDD") 5500.07 (Standards of Conduct), DoDD
12 5500.07-R (Joint Ethics Regulations), and supplements thereto,
13 including 5 C.F.R. Part 2625 (Standards of Ethical Conduct for
14 Employees of the Executive Branch), and 5 C.F.R. Part 3601
15 (Supplemental Standards of Ethical Conduct for Employees of the
16 Department of Defense); and Executive Order 12674 (Principles of
17 Ethical Conduct).

18     5.   Among many others, the official duties of Officers in
19 the U.S. Navy, like CANTÚ, include (1) acquainting themselves
20 with, obeying and, so far as their authority extends, enforcing
21 the laws, regulations, and orders relating to the Department of
22 the Navy; (2) faithfully and truthfully discharging the duties of
23 their offices to the best of their ability in conformance with
24 existing orders and regulations and their solemn profession of the
25 oath of office (Article 1130); (3) requiring themselves to show a
26 good example of virtue, honor, patriotism, and subordination; to
27 be vigilant in inspecting the conduct of all persons who are
28 placed under their command; to guard against and suppress all

- 2 -

dissolute and immoral practices, and to correct, according to the laws and regulations of the U.S. Navy, all persons who are guilty of them; and take all necessary and proper measures, under the laws, regulations and customs of the naval services, to promote and safeguard the morale, the physical well-being and the general welfare of the officers and enlisted persons under their command or charge (Article 1131); (4) reporting as soon as possible to superior authority all offenses under the Uniform Code of Military Justice ("UCMJ") which come under their observation (Article 1137); (5) complying with all directives issued by the Secretary of Defense and Secretary of the Navy regarding the Standards of Conduct and Government Ethics (Article 1110); and (6) reporting in writing any fraudulent, collusion, or improper conduct by a U.S. Navy contractor (Article 1115).

6. To perform his duties, CANTÚ held a "Top Secret" clearance as a prerequisite to handling various types of classified information. Additional regulations prescribe the official duties of U.S. Navy Officers in the handling of classified information, including DoDD 5200.2-R, which requires among other duties that individuals having access to classified information must promptly report to their security office: any unauthorized disclosure to any person of classified information or of other information, disclosure of which is prohibited by Statute, Executive Order, or Regulation (C2.2.1.5); the disregard of public law, Statute, Executive Order, or Regulation (C2.2.1.7); any criminal or dishonest conduct (C2.2.1.8); any acts of omission or commission that indicate poor judgment, unreliability, or untrustworthiness (C2.2.1.9); any vulnerability to coercion,

influence, or pressure that may cause conduct contrary to the national interest (C2.2.1.11); and any acts of sexual misconduct or perversion indicative of moral turpitude, poor judgment or lack of regard for the laws of society (C2.2.1.17). Co-workers shoulder an equal official duty to report when "they become aware of information with potentially serious security significance regarding someone with access to classified information" in a sensitive position (C9.1.5).

7.     DoDD 5240.06 prescribes the official duties of Department of Defense personnel, including CANTÚ, related to counterintelligence awareness and reporting.   In particular, DOD personnel must report certain enumerated contacts, activities, indicators, and behaviors as potential foreign intelligence entity threats against the DOD, its personnel, information, materiel, facilities, and activities or against U.S. national security. Mandatory reporting obligations inure to the following activities, among others: any improper handling or disclosure of classified information; attempts to entice co-workers into criminal situations that could lead to blackmail or extortion; attempts to entice DOD personnel into situations that could place them in a compromising position; and attempts to place DOD personnel under obligation through special treatment, favors, gifts, or money.

8.     Leonard Glenn Francis ("Francis"), charged elsewhere, was a citizen of Malaysia, residing in Singapore.   Francis was the owner, Chief Executive Officer, and President of Glenn Defense Marine (Asia) ("GDMA"), a multi-national corporation with headquarters in Singapore.   Francis utilized the email addresses Leonard.Glenn.Francis@gmail.com and Leonard@glennmarinegroup.com

- 4 -

and in emails was referred to by the following nicknames, among others: "Lion King," "LK," and "Boss."

9.   As of September 2013, GDMA had operating locations in many countries, including Japan, Thailand, Malaysia, Korea, Hong Kong, Indonesia, Australia, Philippines, and the United States. GDMA's main business involved the "husbanding" of marine vessels, a service it had provided across the Seventh Fleet's area of responsibility (AOR) under various contracts with the U.S. Navy for over 25 years.  "Ship husbanding" involves the coordinating, scheduling, and direct and indirect procurement of items and services required by ships and submarines when those vessels arrive at port.   Examples of these items and services included tugboats; fenders; port authority or customs fees; security; food; fuel; water; trash removal; collection, holding, and transfer of liquid waste ("CHT"); and transportation, among many others.

10.   The offenses described herein began or were committed out of the jurisdiction of any particular district, and the offender, CANTÚ, as well as one or more joint offenders was arrested within the Southern District of California.

### COUNT ONE - Conspiracy (18 U.S.C. § 371)

11.   The allegations in Paragraphs 1 through 10 of this Information are hereby re-alleged and incorporated herein.

12.   From in or about May 2012 and continuing until in or about September 2013, on the high seas and out of the jurisdiction of any particular district, defendant U.S. Navy Captain JESUS VASQUEZ CANTÚ, Leonard Francis, and others did knowingly and intentionally conspire and agree to commit an offense against the

1  United States, namely bribery; that is, CANTÚ, Francis, and
2  others, knowingly and intentionally agreed that in return for
3  CANTÚ being influenced in the performance of his official acts and
4  in return for CANTÚ being induced to do and omit to do acts in
5  violation of his official duties, CANTÚ would directly and
6  indirectly, corruptly demand, seek, receive, and accept, things of
7  value, including meals, entertainment, hotel expenses, and the
8  services of prostitutes from Francis; and CANTÚ and others took
9  overt acts in furtherance of this conspiracy in violation of Title
10 18, United States Code, Section 201(b)(2)(A) and (C).

11                    OBJECTS OF THE CONSPIRACY

12      13.  It was an object of the conspiracy for CANTÚ to use his
13 position and influence in the U.S. Navy to perform official acts;
14 to exert pressure on other officials to perform official acts; and
15 to advocate before and advise other officials, knowing and
16 intending that such advocacy and advice would form the basis for
17 their official acts, all to advance GDMA's interests, as
18 questions, matters, and controversies regarding GDMA's ship
19 husbanding business were brought to his attention.  In return,
20 Francis and others would offer and give a stream of benefits to or
21 on behalf of CANTÚ, including meals, entertainment, hotel
22 expenses, and the services of prostitutes.

23      14.  It was a further object of the conspiracy for CANTÚ to
24 be induced to do and omit to do acts in violation of his official
25 duties, and in return, Francis and others would offer and give a
26 stream of benefits to or on behalf of CANTÚ, including meals,
27 entertainment, hotel expenses, and the services of prostitutes.

28

1            MANNERS AND MEANS OF THE CONSPIRACY

2      15.   In furtherance of this conspiracy, and to accomplish its

3  objects, the following manners and means were used, among others:

4      a.   CANTÚ would demand, seek, receive, and accept

5  things of value from Francis and others.

6      b.   Francis and others would offer and give a stream of

7  benefits to or on behalf of CANTÚ, including meals, entertainment,

8  hotel expenses, and the services of prostitutes.

9      c.   In return for this stream of benefits, CANTÚ would

10  use his position and influence in the U.S. Navy to perform

11  official acts; to exert pressure on other officials to perform

12  official acts; and to advocate before and advise other officials,

13  knowing and intending that such advocacy and advice would form the

14  basis for their official acts, all to advance GDMA's interests, as

15  questions, matters, and controversies regarding GDMA's ship

16  husbanding business were brought to his attention.

17      d.   In return for this stream of benefits, CANTÚ would

18  do and omit to do acts in violation of his official duties.

19      e.   CANTÚ would attempt to conceal the nature and

20  source of the bribe payments that he received from Francis and

21  others by, among other things, using personal and non-official

22  email accounts to communicate with Francis and GDMA in a manner

23  designed to obfuscate the true nature of their corrupt

24  relationship; and on at least one occasion making materially false

25  statements and material omissions to a federal law enforcement

26  officer regarding the nature and extent of his relationship with

27  Francis and his receipt of things of value, including the services

28  of prostitutes, from Francis.

OVERT ACTS

16.   In   furtherance   of   the   conspiracy   and   to   effect   its object, the following overt acts, among others, were committed:

a.   On or about May 23, 2012, CANTÚ sent Francis an email from one personal email account, copying another, secondary personal email account, and informed Francis that he preferred to be contacted via email at either of those email addresses.

b.   During the subsequent email exchange, CANTÚ said he might visit Francis if Francis brought back a prostitute from his pending   trip   to   Thailand.   Francis   responded   to   CANTÚ   by forwarding him an email string pertaining to the purchase of fuel by the USS Chafee in Apia, Samoa, explaining to CANTÚ that they would discuss further at dinner.

c.   On or about June 1, 2012, Francis paid for dinner for CANTÚ at Tatsuya restaurant in Singapore at the cost of $560.35 SGD.   That evening, Francis also provided CANTÚ with the services of two prostitutes at the Hilton Singapore.   Francis had flown   the   prostitutes   in   from   another   country   and   secured accommodations for them at the Hilton Singapore at the additional cost of $675 SGD/night.

d.   On or about June 2, 2012, CANTÚ texted Francis and asked if the prostitutes remained available later that evening. Francis responded that CANTÚ should call on the prostitutes, as they were still available, and he thanked CANTÚ for his "time and insights"   during   their   dinner   meeting   the   previous   evening. Francis also sent CANTÚ a PowerPoint presentation that Francis had previously provided to another U.S. Navy Officer, RC, who was the Seventh Fleet Logistics Officer, a position CANTÚ previously held,

- 8 -

so that CANTÚ could advocate before RC and influence RC's actions vis-à-vis GDMA. Contemporaneous emails revealed RC was questioning GDMA's pricing and practices.

      e.  On or about June 20, 2012, Francis emailed CANTÚ and asked him if he had reviewed the PowerPoint slides and invited him to dinner.

      f.  On or about June 23, 2012, Francis paid for dinner and drinks for CANTÚ in the Orchard Road area of Singapore.

      g.  On or about July 6, 2012, Francis hosted CANTÚ and a female companion for drinks at the Hilton Singapore and dinner at Tatsuya. On this occasion, $2,849.66 SGD was charged to Francis's American Express credit card, which included charges for a hotel room. After the dinner, CANTÚ sent Francis an email with two attachments which had been discussed at dinner, including, a biography of a retired U.S. Navy Officer, AB, and a capabilities brief of a logistics provider which competed with GDMA for the award of U.S. Navy contracts with MSCFE.

      h.  On or about September 5, 2012, Francis hosted CANTÚ and others for dinner at Tatsuya at a cost of over $1000 SGD.

      i.  On or about September 21, 2012, CANTÚ texted Francis and provided him an update on his trip to Yokosuka, Japan. CANTÚ informed Francis that he met with the new Naval Supply Systems Command (NAVSUP), Fleet Logistics Center (FLC) Yokosuka Commanding Officer, MF, and that he stressed to MF the importance of meeting with the husbanding service providers, including GDMA. CANTÚ also told Francis that the USS Vandegrift did not receive its scheduled fuel from GDMA during a Vladivostok, Russia port visit, and that NAVSUP FLC was investigating.

1          j.   On or about October 16, 2012, Francis sent CANTÚ
2    internal, proprietary U.S. Navy emails from NAVSUP FLC related to
3    the USS John C. Stennis's port visit to Sepangar, Malaysia.
4    Francis entitled his email "JCS Sepangar Bias" and complained
5    about a "marginal" rating GDMA had received from the ship for that
6    port visit, which Francis felt was "instigated" by NAVSUP FLC.

7          k.   On or about October 18, 2012, Francis sent CANTÚ
8    internal, proprietary U.S. Navy emails from NAVSUP FLC related to
9    GDMA's poor performance during the USS John C. Stennis's port
10   visit to Phuket, Thailand.  Francis entitled the email "JCS Phuket
11   Bias" and complained of an "institutional level bias in an attempt
12   to marginalize" GDMA.   Francis also complained about the U.S.
13   Navy's intent to limit the number of port visits to Port Klang,
14   Malaysia, which he owned.

15         l.   On or about February 15, 2013 and February 22,
16   2013, Francis forwarded CANTÚ emails he exchanged with NAVSUP FLC
17   Yokosuka personnel regarding issues related to GDMA's refusal to
18   grant Online Pricing Application access to U.S. Navy employees
19   assigned to the Pacific Fleet and issues related to port tariffs
20   charged by GDMA in Laem Chabang, Thailand.

21         m.   On or about February 15, 2013, CANTÚ texted Francis
22   a request to coordinate prostitutes, specifically "UK expats," for
23   CANTÚ during an upcoming trip to Yokosuka, Japan.

24         n.   On or about June 21, 2013, Francis hosted CANTÚ and
25   others for drinks at the Long Bar at the Raffles Hotel in
26   Singapore, dinner at Tatsuya, which cost $788.60 SGD, and the
27   services of prostitutes.

28

- 10 -

o.   On or about August 22, 2013, CANTÚ emailed Francis claiming credit for his role in the U.S. Navy's decision to validate and process payment for the port tariffs charged by GDMA in Laem Chabang, Thailand.

p.   On or about August 30, 2013, Francis asked CANTÚ to divulge the classified information whether the USS Nimitz Carrier Strike Group port visits to Manila and Cebu, Philippines, were delayed or cancelled.  CANTÚ responded that he would reach out to Commander, Task Force 70 and Seventh Fleet and forward any "intel received." On or about August 31, 2013, CANTÚ responded to Francis that the NAVSUP FLC Singapore Site Director, JK, was awaiting the unclassified cancellation in order to "formally notify" Francis.

q.   On or about September 13, 2013, Francis invited CANTÚ to dinner and asked CANTÚ for the daily cost to operate an MSC supply ship at sea.  CANTÚ accepted the dinner invitation and provided Francis with the daily cost data for three classes of MSC supply ships, though this information was proprietary U.S. Navy information and not for public release.

r.   On or about September 13, 2013, Francis hosted CANTÚ, another U.S. Navy Officer, DM, and others for dinner at Tatsuya. Francis also hosted CANTÚ and DM to an evening of partying and prostitutes at Brix nightclub at the Grand Hyatt and karaoke at the Tiananmen KTV Lounge in Singapore, at a cost of approximately $6,203.41 SGD.

1          s.    In  or  about  September  2013,  when  CANTÚ  was
2    interviewed  by  an  NCIS  agent,  CANTÚ  made  materially  false
3    statements and material omissions regarding the nature and extent
4    of  his  relationship  with  and  his  receipt  of  things  of  value,
5    including the services of prostitutes, from Francis.

6      All in violation of Title 18, United States Code, Section 371.

7

8    ALANA W. ROBINSON
9    Acting United States Attorney

10   By:
         MARK W. PLETCHER
11       PATRICK HOVAKIMIAN
         Assistant U.S. Attorneys
12

13   SANDRA MOSER
14   Acting Chief, Fraud Section

15   Criminal Division

16   By:  BRIAN R YOUNG/AWP
         BRIAN R. YOUNG
17       Assistant Chief
         Fraud Section, Criminal Division
18

19

20

21

22

23

24

25

26

27

28
                              - 12 -